# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JACK L. WEAVER, | CASE NO. 3:13-cv-00337-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION  TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 7, 8, 13, 14 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Jack L. Weaver's applications for social security disability insurance benefits and supplemental security income benefits. The crux of Plaintiff's appeal is that the Administrative Law Judge ("ALJ") erred in discrediting a report by Dr. John Kelsey that Plaintiff suffered marked, not moderate, limitations in interacting with co-workers and supervisors, a report by Dr. Kathy Nase that Plaintiff would be absent from work more than three days per month and unable to attend work regularly and on time, and Plaintiff's testimony that work stress, panic attacks, and angry outbursts precluded him from maintaining full-time employment. For the reasons that follow, the Court finds that the ALJ had substantial evidence to find that Plaintiff suffered only a moderate limitation in interacting with co-workers and supervisors, that Plaintiff would be able to attend work regularly and on time, that Plaintiff

could tolerate low work stress, and that Plaintiff's panic attacks and angry outbursts would not preclude him from working full-time. Therefore, the Court recommends that Plaintiff's appeal be denied and his case closed.

## II.     Procedural Background

On April 20, 2010, Jack L. Weaver ("Plaintiff") filed an application for Supplemental Security Income benefits under Title XVI of the Social Security Act and for disability insurance benefits under Title II of the Social Security Act. (Tr. 150-157). On August 13, 2010, the Bureau of Disability Determination[1] denied this application, and Plaintiff filed a request for a hearing on October 8, 2010.  (Tr. 65-90). On October 14, 2011, a hearing was held before an ALJ at which Plaintiff, who was represented by an attorney, and a vocational expert appeared and testified (Tr. 10-29).  At the hearing, Plaintiff's attorney acknowledged a prior decision dated January 21, 2009 and conceded that res judicata applied to that decision. (Tr. 16). On October 31, 2011, the ALJ found that Plaintiff was not disabled and thus was not entitled to benefits. (Tr. 44-62). On November 11, 2011, Plaintiff filed a request for review with the Appeals Council (Tr. 8), which the Appeals Council denied on December 11, 2012, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-7).

On February 8, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g), to appeal the decision of the Commissioner. (Doc. 1). On April 29, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 7, 8). On June 26, 2013, Plaintiff filed a brief in support of his appeal ("Pl. Brief") (Doc. 13). On July 25, 2013, Defendant filed a brief in response ("Def. Brief") (Doc. 14). On May 1, 2014, the Court

---

[1] The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 77-78.

referred this case to the undersigned Magistrate Judge.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 564 (1988); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Johnson, 529 F.3d at 200.

Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence is satisfied without a large quantity of evidence; it requires only "more than a mere scintilla" of evidence. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).Substantial evidence may be less than a preponderance. Jones, 364 F.3d at 503. Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

A five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. §§ 404.1520, 416.920; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. §§ 404.1520, 416.920. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e).

RFC is an assessment of the most a claimant can do on a regular and continuing basis despite credible limitations. 20 C.F.R. § 404.1545(a). It is an administrative assessment, based on all the evidence, of how a claimant's impairments and related symptoms affect her ability to perform work-related activities. Id.; see also SSR 96-5p, West's Soc. Sec. Reporting Serv., Rulings 126 (Supp. 2013) ("The term 'residual functional capacity assessment' describes an adjudicator's findings about the ability of an individual to perform work-related activities."); SSR 96-8p, West's Soc. Sec. Reporting Serv., 144 (Supp. 2013) ("RFC is an administrative

assessment of the extent to which an individual's medically determinable impairment(s) . . . may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.").

An ALJ must determine the weight to be given to medical opinions in making RFC assessments. The Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight. 20 C.F.R. § 416.927(d)(2). 20 C.F.R. §404.1527(c) establishes the factors to be considered by the ALJ when the opinion of a treating physician is not given controlling weight. Under 20 C.F.R. §§404.1527(c)(1) and (2), the opinions of treating physicians are given greater weight than opinions of non-treating physicians and opinions of examining physicians are given greater weight than opinions of non-examining physicians. 20 C.F.R. §404.1527(c)(2) also differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship. 20 C.F.R. §404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. §404.1527(c)(5) provides more weight to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

Internal inconsistencies are acceptable reasons for rejecting a treating physician's opinion. For instance, in Plummer v. Apfel, 186 F.3d 422, 430 (3d Cir. 1999), the ALJ rejected the opinion of claimant's treating physician that claimant could not use her hands at all. The ALJ explained that she rejected this opinion because the same physician had consistently noted that

the only limitation on the use of claimant's hands was repetitive fine finger manipulation and/or handling, and was therefore internally inconsistent with his limitation that claimant could not use her hands at all. The opinion was also inconsistent with other physicians who reported only a limitation on repetitive fine finger manipulation and/or handling. However, when using internal inconsistencies to discredit a treating physician's report, the internal discrepancies must be truly contradictory:

> The ALJ's decision to discredit Dr. Picciotto, the consultative psychological examiner who evaluated Brownawell in December 2000, is similarly improper. Dr. Picciotto provided a medical source statement which indicated that Brownawell "had poor ability (no ability) [sic] to function in several areas." *A.R.* at 303. The ALJ discounted this finding because it "was inconsistent with and unsupported by the text of the evaluation and the clinical signs and findings in the remaining medical record." *Id.* In support of this contention, the ALJ notes that Dr. Picciotto "stated that [Brownawell] has no ability to maintain attention or concentration [but] he reported in the text of the evaluation that [she] has good focus, good attention, and good concentration." These assessments are not necessarily contradictory, however, as one assessment was describing Brownawell's condition at the time of Dr. Picciotto's examination and the other reflected Dr. Picciotto's assessment of Brownawell's ability to function in a work setting. As discussed *supra,* this Court has admonished ALJs who have used such reasoning, noting the distinction between a doctor's notes for purposes of treatment and that doctor's ultimate opinion on the claimant's ability to work. See Morales, 225 F.3d at 319.

Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 356 (3d Cir. 2008).

At step four, the ALJ applies the claimant's RFC to past relevant work to determine if the claimant can still perform past relevant work. If the claimant cannot perform past relevant work, the ALJ must produce substantial evidence, generally in the form of expert testimony, that claimant would be able to perform other work. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity.

20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that she is unable to engage in past relevant work. In other words, the Plaintiff bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### IV. Relevant Facts in the Record

Plaintiff was born on June 11, 1961, and was classified by the regulations as a "younger individual" at the time of his application. 20 C.F.R. § 404.1563(b). (Tr. 16). Plaintiff was fifty years old on the date of the ALJ decision, and was classified by the regulations as a person "approaching advanced age." 20 C.F.R. § 404.1563(c). (Tr. 16). He has at least a high school education and past relevant work as a cashier at a convenience store, a material handler, a forklift operator, and a veneer cutter or slicer. (Tr. 26).

On May 22, 2010, Plaintiff's mother completed a Function Report. She indicated that Plaintiff eats only cereal, and that he used to cook daily. (Tr. 185). She stated that he has problems getting along with family, friends, neighbors or others because he becomes anxious, frustrated and angry around other people. (Tr. 188). In response to how well Plaintiff gets along with authority figures, his mother wrote "not well." (Tr. 189).

On June 2, 2010, Plaintiff completed a Function Report. (Tr. 211). Plaintiff reported that

he goes to work twice a week from 8 a.m. until 1 p.m. (Tr. 212). Plaintiff reported that he eats only cereal and cold canned food "out of the can." (Tr. 193). Plaintiff indicated that he has been doing less photography, and would like to do more. (Tr. 195). He reported that he does not spend time with others. (Tr. 195). He reported that he does not speak with his sister or her children, rarely sees his neighbor, and does not socialize. (Tr. 196). In response to a question asking how well Plaintiff gets along with authority figures, he wrote "I don't." (Tr. 197). In response to a question asking whether Plaintiff had ever been fired or laid off from a job because of problems getting along with other people, Plaintiff cited to an incident in 2007 where he hit a co-worker after getting into an argument while working. (Tr. 197).

Plaintiff began treatment at Community Services Group on December 1, 2006 for depressive symptoms, stress management difficulties, self-esteem issues, and sleep disturbances related to panic attacks. Plaintiff was living with his mother and his mother's in home attendant. (Tr. 323). He also presented with suicide ideation. (Tr. 323). He reported issues from his childhood, that he does not socialize with other people except on the computer, and a history of alcohol and drug abuse. (Tr. 326).

In April, 2007, Plaintiff assaulted his mother's caregiver and was hospitalized after a suicide attempt from April 10 to April 20, 2007. (Tr. 240-300). At his next appointment at Community Services Group, he was diagnosed with intermittent explosive disorder. (Tr. 320). However, by September 12, 2007, his diagnoses included only mild major depressive disorder and generalized anxiety disorder. (Tr. 319). In a psychiatric evaluation on September 25, 2007, Plaintiff reported "on and off" depression over the last six years, and denied "having any significant stressors at this time." (Tr. 308). He reported that his current dose of medication had

improved his mood, but that he had episodes of "rage." (Tr. 308). Plaintiff reported that he had

assaulted or threatened to assault his foster siblings as a child, assaulted a woman several years

earlier, recently assaulted a friend with a phone, and referred to the assault against his mother's

caregiver. (Tr. 308). In his mental status exam, Plaintiff was noted to have normal speech,

depressed mood but no suicide ideation or paranoia, no hallucination, good insight and judgment,

and was alert and oriented. (Tr. 310). He also had blunted affect and admitted to racing thoughts.

(Tr. 310). Plaintiff was diagnosed with Bipolar II Disorder and substance dependence. (Tr. 310).

Dr. Stevenson also indicated that he would need to rule out intermittent explosive disorder and

Bipolar I disorder. (Tr. 310). On October 24, 2007, Plaintiff reported a "bad blow up" with a

friend, although he was "able to walk out of the house," and was having "a few" panic attacks.

(Tr. 307).

On January 14, 2008, Plaintiff saw his primary care physician, Dr. Nase. (Tr. 433-34).

Plaintiff complained that he was not sleeping well, had vivid dreams, and was advised to follow

up with the psychiatric department. Plaintiff was also assessed to have depression. (Tr. 433-34).

Plaintiff was alert and pleasant with an appropriate affect on January 28, 2008. (Tr. 432).

However, Plaintiff also reported that he was under psychiatric care and counseling, that he had

been out of work since a "nervous breakdown" in April of 2007, that he has a problem with

anxiety and frequent panic attacks, sleeps a lot, stays to himself, avoids people and has a fear of

being around a lot of people, stays in his room for most of the day, shops for groceries at night,

and "mostly eats cereal." (Tr. 431).

On January 28, 2008, Dr. Nase completed a multiple impairment questionnaire. (Tr. 364-

371). She indicated that his diagnoses were bipolar disorder, explosive anger disorder, anxiety

and panic attacks. (Tr. 364). His primary symptoms were anxiety and panic attacks with heart racing and shortness of breath, explosive anger with yelling, throwing things, and hitting people, and depression with social avoidance. (Tr. 365). She reported that he was fatigued at a scale of six out of ten as a result of his medications. (Tr. 366). She opined that Plaintiff could not do a full time competitive job that required activity on a sustained basis. (Tr. 369). She opined that Plaintiff's symptoms interfered with his attention and concentration "constantly." (Tr. 369). She stated that Plaintiff was incapable of tolerating even "low stress" work pressures. (Tr. 369). She opined that Plaintiff's impairments were not likely to produce "good days" and "bad days." (Tr. 370).

Plaintiff was discharged from the care of Dr. Stevenson because he was relocating on July 9, 2008. (Tr. 302). Plaintiff reported that he was not depressed and not getting angry on October 15, 2008,  however, Plaintiff's psychiatric exam was "abnormal," his sleeping was abnormal, and he was assessed to have anxiety, intermittent explosive personality disorder, and depression. (Tr. 425-27). On January 20, 2009, Plaintiff saw Dr. Daksina Walgampaya, M.D., for a follow-up of anxiety and bipolar disorder. (Tr. 420, 515). Plaintiff denied suicide ideation and stated that he was doing well. (Tr. 421). Dr. Walgampaya indicated that his bipolar disorder was very well controlled. (Tr. 515).

On April 14, 2009 Plaintiff's affect was normal, he was not anxious, he denied hallucinations, he had no mood swings, he had normal attention span and concentration, he did not have pressured speech, and he did not have suicidal ideation, although he did have cannabis dependence. (Tr. 400-401). Plaintiff also saw Stephanie Haulman, M.S.W., on April 14, 2009, and was discharged from her care. (Tr. 312). Plaintiff was noted to have a "limited" support

system, decreased symptoms, and was appropriately using coping symptoms. (Tr. 312).

However, on June 24, 2009, Plaintiff's depression was "up and down," was experiencing panic

attacks with shortness of breath, dizziness, and nausea, was experiencing anxiety around other

people, and was "positive for" anxiety, depression, fearfulness, insomnia, mood swings, prior

hospitalizations, a past history of suicide attempts, psychiatric symptoms, a past history of

hallucinations and sleep disturbances. (Tr. 403-04).  The notes state that he "has poor attention

span and concentration" and was having memory loss (Tr. 404).

On June 24, 2009, Dr. Nase also completed a Psychiatric/Psychosocial Impairment

Questionnaire. (Tr. 503-510). She indicated that his diagnoses were bipolar disorder, depression,

anxiety, explosive personality disorder, and occasional use of drugs and alcohol. (Tr. 503). She

opined that his prognosis was poor. (Tr. 503). She indicated that Plaintiff suffered from poor

memory, appetite disturbance, sleep disturbance, personality change, mood disturbance,

emotional fability, past history of delusions or hallucinations, substance dependence, recurrent

panic attacks, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty

thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased

energy, persistent irrational fears, generalized persistent anxiety, hostility and irritability. (Tr.

504). On September 20, 2009, Plaintiff had normal insight, judgment, and speech and was not

agitated, although he had a depressed affect. (Tr. 406-07). However, his depression was noted as

"worsening," and that there was no specific trigger for his worsening symptoms. (Tr. 406).

On December 8, 2009 and February 9, 2010, Plaintiff was "doing well" and Dr. Nase

assessed that Plaintiff's depression was "stable." (Tr. 412-13, 415-16). These notes also indicate

that Plaintiff was having a "bad time recently" because he gets angry with his roommate and

wanted him to leave and has social fears, but was negative for anxiety, depression, hallucinations, inability to focus, mood swings, and suicidal ideation. On May 12, 2010, Dr. Nase's notes indicate that he "has good days and bad days," "some depression and anxiety," he "feels meds help," and that he got rid of his roommate. (Tr. 418). Although the notes indicate that Plaintiff was positive for anxiety, they also say "patient is not agitated, is not anxious." (Tr. 419). Dr. Nase also characterized Plaintiff's depression as "stable." (Tr. 419).

On June 9, 2010, Dr. Nase opined that Plaintiff *was* capable of low-stress work, but that he would be absent more than three times per month "based on the severity of control at that time." (Tr. 398-99). Dr. Nase also indicated that Plaintiff was only moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 396). Dr. Nase assessed only a mild limitation in the ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 396).

On June 22, 2010, Plaintiff had an evaluation with a therapist S.E. King, M.S.W. (Tr. 702-707). Plaintiff had self-reported for treatment because of overwhelming anxiety and anger. (Tr. 707).  He reported that his depression had gotten worse since he evicted his roommate and that he missed his roommate. (Tr. 702). He reported that he was helpless and angry about "wrongs in the world." (Tr. 702). He was also assessed to have irritability, anger, racing thoughts, and generalized anxiety. (Tr. 703). Plaintiff referred to his 2007 assault on his mother's caretaker as his most recent legal problems. (Tr. 706). He was diagnosed with bipolar disorder and generalized anxiety disorder. (Tr. 707). On July 26, 2010, Plaintiff reported to Dr. King that

he was "close with his boss" and that his boss was "supportive." (Tr. 701).

On August 2, 2010, Plaintiff was evaluated by state agency consultant John Kelsey, Ph.D. (526-529). Dr. Kelsey assessed no limitations on Plaintiff's ability to understand, remember, and carry out instructions. (Tr. 535). Dr. Kelsey assessed a marked limitation in Plaintiff's ability to interact appropriately with the public, co-workers, and supervisors. (Tr. 535). On September 14, 2010, Dr. Nase noted that Plaintiff was "negative for" isolating behaviors or an increase in depression. (Tr. 558). He stated that he was walking and riding a bike for exercise and that his "meds are helping but that it could be a little better." (Tr. 558). Again, Dr. Nase wrote that Plaintiff "has good and bad days" but that "patient is not agitated, is not anxious" and that his depression was "stable." (Tr. 559).

On January 3, 2011, Plaintiff was still depressed and had stopped exercising, but was sleeping better. (Tr. 560). Dr. Nase increased Plaintiff's depression medication. (Id.). Although Plaintiff was listed as "positive for" anxiety and depression, the notes also state that "the patient is not agitated, is not anxious."  (Tr. 560-61). On April 4, 2011, Dr. Nase's notes state that his current symptoms include "anxious mood," that he has "more anxiety" but "less depression," presents with "anxiety and depression," and was still in counseling. (Tr. 562). However, Plaintiff was also listed as "negative for depression." (Tr. 562). Plaintiff saw Ms. King on May 5, 2011 and August 9, 2011. Plaintiff reported that he enjoys nature walks, photography, time with his mother, and "enjoys work." (Tr. 697-98). Plaintiff was assessed GAF scores of 60-65, which indicates mild symptoms. (DSM-IV-TR).

At the hearing before the ALJ, Plaintiff testified that he was working at Dolly's Diner, but had cut down to one day a week from two at the suggestion of his doctors and management

because he was getting "weirded out." Plaintiff testified that he had panic attacks three to four times a week for two to three minutes at a time where his heart races and he has shortness of breath. (Tr. 19). He stated that he couldn't work full time because it was "just too stressful and I have the panic attacks…and the anxiety." (Tr. 19). He testified that he was regularly able to attend work at Dolly's Diner and be on time. (Tr. 21). He testified that he did not grocery shop, was no longer exercising, was having a hard time keeping up with chores, and was continuing to care for his mother. (Tr. 21-24). He also testified that he has anger problems where he will "just go ballistic" one to two times per month or less. He also testified that he did not go out at all.

The ALJ posited that Plaintiff could work at all exertion levels, subject to the following limitations: simple routine tasks, low stress work environment defined as occasional decision-making and occasional changes in the work setting, and occasional interaction with the public, co-workers, and supervisors. (Tr. 26). The vocational expert testified that, with those limitations, Plaintiff could not perform his past relevant work. (Tr. 26-27). The vocational expert testified that Plaintiff would be able to work in positions that include a packager, a production helper, and a janitor. (Tr. 27). The vocational expert also testified that if Plaintiff would require no interaction with supervisors, there would be no competitive employment. (Tr. 27).

### V.    Plaintiff Allegations of Error

### A.    The ALJ's credibility assessment

Plaintiff alleges that the ALJ failed to properly evaluate the credibility of Plaintiff's complaints because the ALJ failed to address the factors identified in 20 C.F.R. §§404.1529(c)(3) and 416.927(c)(3). The Court finds that the ALJ had substantial evidence to discredit Plaintiff's testimony that work stress, panic attacks, and angry outbursts precluded him

from maintaining full-time employment.

Plaintiff testified that he could not handle the stress of more hours at his restaurant job. However, there is no indication a restaurant job is "low stress." None of Plaintiff's testimony suggests that he is incapable of handling low-stress jobs, or that he has ever been fired from a low-stress job.  Dr. Nase, Plaintiff's treating physician, and Dr. Perch opined that Plaintiff could tolerate low stress jobs. Thus, substantial evidence supports the ALJ's finding that Plaintiff could work low-stress jobs.

Plaintiff testified that he has frequent panic attacks and has been unable to maintain a job because of explosive anger. However, Plaintiff also testified that he had been able to maintain a job at Dolly's Diner for the eighteen months preceding the hearing without any incidents of explosive anger or panic attacks interfering with his employment. Moreover, while Plaintiff discussed panic attacks in medical records from 2007 and January of 2008 (Tr. 307, 385-86) he did not discuss incidents of explosive anger in any subsequent records from February of 2008 through 2011, with the exception of one "outburst" that he vaguely described to Dr. Kelsey in August of 2010. (Tr. 312-317, 328, 420-430, 460-480,483-84, 515, 530, 558-569).  On June 24, 2009, Dr. Nase opined that Plaintiff suffered from "occ [occasional] panic attacks but usually not too bad." (Tr. 403).  On June 9, 2010, Dr. Nase's opinion noted that Plaintiff was not suffering from recurrent panic attacks, hostility, or irritability. (Tr. 393). Although she indicated that Plaintiff had suffered from "anxiety attacks," none of her notes from anytime after June 24, 2009 indicate that Plaintiff suffered from "anxiety attacks" or panic attacks (Tr. 393, 406, 408-410, 412-419, 460-480, 483-84, 558-569). Aside from Dr. Nase's note on June 24, 2009, the only other mention of panic attacks in any of Plaintiff's records from any provider after 2007 was an

indication by Steve King at Plaintiff's June 22, 2010 that Plaintiff suffered from panic attacks in "crowds." These brief, isolated references to panic attacks do not undermine the ALJ's finding that Plaintiff's panic attacks and outbursts do not preclude him from full-time employment given the absence of reported symptoms from panic attacks or outbursts in the vast majority of Plaintiff's medical records.

Thus, the ALJ had substantial evidence for finding that Plaintiff's testimony that panic attacks and explosive anger preclude him from full-time employment. The ALJ's credibility finding is entitled to deference and should not be discarded lightly, given her opportunity to observe the individual's demeanor, Murphy v. Schweiker, 524 F. Supp. 228, 232 (E.D. Pa. 1981), and an ALJ's credibility determination need only be supported by substantial evidence on the record as a whole, Miller v. Commissioner of Soc. Sec., 172 F.3d 303, 304 n.1 (3d Cir. 1999). Because the ALJ considered Plaintiff's subjective statements and testimony of his limitations and, as the finder of fact, assessed the credibility in the context of all the other evidence before her, her determination that Plaintiff's statements and testimony were not fully credible is supported by substantial evidence.

### B.      The weight assigned by the ALJ to the medical opinions

#### 1.      Dr. Nase's Reports

Plaintiff alleges that Plaintiff erred in rejecting her opinion on January 28, 2008 and June 29, 2009 that Plaintiff suffered from marked limitations in interacting with supervisors and co-workers. Plaintiff also alleges that the ALJ erred in rejecting her opinion on January 28, 2008, June 29, 2009, and June 9, 2010 that Plaintiff would be unable to attend work regularly and on time and would be absent more than three days per month.

The ALJ did not state how much weight she gave to Dr. Nase's January 28, 2008, June 29, 2009, and June 9, 2010 Reports. It appears the ALJ rejected these reports outright, noting that "[t]hese records are not consistent with treatment records in 2008 and 2009, which showed improvement with treatment and remaining clean from drugs and alcohol." (Tr. 55). Plaintiff alleges that the ALJ erred in finding that the 2008 and 2009 Reports were inconsistent with the 2008 and 2009 treatment notes and that these notes did not demonstrate improvement. Defendant responds that the notes did indicate improvement, and points to treatment notes that are purportedly inconsistent.

The Court finds that Dr. Nase's treatment notes from January 28, 2008 are not inconsistent with her January 28, 2008 report. Both identified anxiety, panic attacks, social phobia, and Plaintiff's "nervous breakdown." The Court also finds that Dr. Nase's June 24, 2009 report was not inconsistent with her notes from January 28, 2008 through June 24, 2009 and that these notes do not indicate improvement. Plaintiff's depression was noted as worsening through September 20, 2009. Plaintiff's condition began improving in December, 2009 and February, 2010, but these treatment notes are for several months after Dr. Nase's June 24, 2009 Report. The Court also finds that Dr. Nase's June 9, 2010 Report was consistent with her treatment notes. The June 9, 2010 Report indicated much lower limiting effects of Plaintiff's symptoms, which is consistent with the treatment records that showed improvement at the end of 2009 and 2010.

The Court finds that the ALJ properly rejected a one paragraph letter from Dr. Nase dated August 17, 2010. In contrast to the detailed report from June 9, 2010, where she opined that Plaintiff could handle low-stress work, she wrote that he gets frustrated and angered easily in

"any" stressful situation. (Tr. 555). She also wrote that his prognosis was poor, while her June 9, 2010 report showed that his prognosis was fair. (Tr. 555). There are no treatment notes for the time period between June 9, 2010, and August 17, 2010 to explain this discrepancy. The August 17, 2010 report provides no rationale for these conclusions and is not supported by concurrent medical evidence. Thus, while the ALJ erred in discrediting Dr. Nase's January 28, 2008 and June 24, 2009 Reports on the grounds that they were inconsistent with her treatment notes and that these notes show improvement, the ALJ did not err in rejecting Dr. Nase's conclusory, one paragraph August 17, 2010 Report.

The ALJ's error in discounting Dr. Nase's 2008 and 2009 reports on the grounds of internal inconsistencies was harmless. The ALJ largely incorporated Dr. Nase's most recent findings into the hypothetical posed to the vocational expert. Although Dr. Nase's earlier reports showed a marked limitation in Plaintiff's ability to interact with co-workers and supervisors, her June 9, 2010 report indicated that Plaintiff was only moderately limited in this respect. This is identical to the moderate limitation assigned in those categories by Dr. Perch, whose opinion was given significant weight. The only opinions by Dr. Nase that were not included in the hypothetical were her belief that Plaintiff would be absent from work more than three times per month and that Plaintiff could not sustain a full-time job. Even if the ALJ had afforded Dr. Nase great weight, he would not have had to fully credit each of her conclusions. Lee v. Comm'r Soc. Sec., 248 F. App'x 458, 461 (3d Cir. 2007)(Upholding the findings of the ALJ where the ALJ had afforded "great weight" to the opinions of treating physicians, but did not "fully credit" them where there were treatment gaps in their records that undermined Plaintiff's claimed severity); Carter v. Comm'r of Soc. Sec., 511 F. App'x 204, 205-06 (3d Cir. 2013)(Upholding the findings

of the ALJ where the ALJ afforded treating physician "great weight" but discounted statement that claimant was unable to work where progress notes failed to lend support for that statement).

Here, her conclusion that Plaintiff would be absent was inconsistent with substantial record evidence. Plaintiff testified that he was able to get to work regularly and be on time for his job at Dolly's Diner. He did not report any attendance problems. He did not report that he had ever been fired from a job because of attendance or timeliness issues, and had been able to maintain most of his jobs for a year or more. Moreover, Dr. Nase failed to provide supporting rationale or cite to medical findings to support her belief that Plaintiff would be absent three or more times per month.  Dr. Nase's beliefs that Plaintiff is disabled and cannot hold a full-time job are opinions on topics that are reserved to the Commissioner. See 20 C.F.R. §§404.1527(d)(1), 416.927(d)(1); Masher v. Astrue, 354 F. App'x 623, 628 (3d Cir. 2009).Thus, while the ALJ discounted her report for an improper reason, the ALJ still had substantial evidence to conclude that Plaintiff was only moderately limited in his ability to interact with co-workers and supervisors and that Plaintiff would not be absent more than three times per month.

### 2.      Dr. Kelsey's Report

Plaintiff alleges that the ALJ erred in rejecting Dr. Kelsey's report and assessment that Plaintiff had a marked limitation in interacting with co-workers and supervisors. It is unclear what weight the ALJ assigned the Dr. Kelsey's report and assessment. The ALJ merely states that "[t]he marked difficulties listed for social functioning are not supported by the medical reports." (Tr. 56). Plaintiff alleges that the ALJ fails to point to specific inconsistencies, which makes this rationale difficult to evaluate, and that the ALJ failed to acknowledge various observations by Dr. Kelsey. (Pl. Brief at 26).

Defendant responds that Dr. Kelsey's report was inconsistent with the record because Plaintiff's therapist reported that Plaintiff was close with his boss, who was supportive, and that Plaintiff enjoyed spending time with his mother. (Def. at 27).  Defendant also cites to Dr. Perch's report, which stated that Dr. Kelsey's report overestimated the severity of Plaintiff's limitations. Defendant contends that the ALJ appropriately assigned significant weight to Dr. Perch's report because the regulations explicitly instruct an ALJ to consider the opinions of state agency psychologists, who are highly qualified experts, and because he was able to formulate his opinion "in light of the larger record." (Def. Brief at 26).

The Court finds that it cannot evaluate the weight given to Dr. Kelsey's report because the ALJ did not state the weight given to the report. However, even if the ALJ had afforded Dr. Kelsey's report great weight, substantial evidence would still support the ALJ's finding that Plaintiff suffered only from a moderate limitation in interacting with supervisors and co-workers and therefore could interact with co-workers and supervisors occasionally.  The ALJ would have had substantial evidence for this finding even if Dr. Kelsey's report was afforded great weight because Plaintiff's treating physician, Dr. Nase, opined that Plaintiff was only moderately limited in these areas, that Plaintiff reported a good relationship with his boss, had worked for almost eighteen months without incident at Dolly's Diner, identified no recent confrontations with supervisors or coworkers, and reported improvement with medication in 2010 and 2011. The ALJ included every other limitation identified by Dr. Kelsey. Affording Dr. Kelsey's opinion great weight would not have changed the hypothetical posed to the vocational expert. Thus, the ALJ's error in failing to specify the weight assigned to Dr. Kelsey's report was harmless.

### 3.      Dr. Perch's Report

The Plaintiff also alleges that the ALJ erred in giving significant weight to the non-treating, non-examining state agency psychologist Paul Perch, Ed. D, because he did not discuss how Perch's opinion was consistent with the record or cite to anything in the record to support the opinion. The Court finds that the only significant differences between Dr. Perch's report and Dr. Nase's opinion was that Plaintiff would not be absent more than three times per week. As discussed above, the ALJ would have had substantial evidence for rejecting Dr. Nase's opinion in that respect even in the absence of Dr. Perch's report. The only difference between Dr. Perch's report and Dr. Kelsey's report was that Dr. Perch assigned only moderate limitations in interacting with supervisors, while Dr. Kelsey assigned marked limitations in interacting with supervisors. As discussed above, the Court finds that the ALJ would have had substantial evidence that Plaintiff was only moderately limited in his ability to interact with co-workers and supervisors. Thus, even if the ALJ erred in assigning too much weight to Dr. Perch's report, such error was harmless. See  Humphreys v. Barnhart, 127 F. App'x 73, 75-76 (3d Cir. 2005) (improper reliance on a state agency claims adjudicator's opinion to reject the opinions of treating physicians was harmless error where the ALJ also relied on objective medical evidence that also contradicted the opinion of treating physicians.)

### V.      Recommendation

The ALJ had substantial evidence to reject Plaintiff's testimony that work stress, panic attacks, and angry outbursts limited him from maintaining full time employment. The ALJ had substantial evidence to reject Dr. Nase's opinion that Plaintiff could not regularly attend work. The ALJ appropriately accommodated for a moderate limitation in ability to interact with co-

workers and supervisors by limiting him to only occasional interaction with co-workers and supervisors. Brassfield v. Colvin, 4:11-CV-00847, 2013 WL 1345644 (M.D. Pa. Apr. 2, 2013) (Nealon, J.) (Finding that an appropriate accommodation for moderate social limitations was to limit claimant to "occasional" interaction with co-workers and supervisors and appropriate accommodation for marked limitation in interacting with the public was to limit claimant to "no" interaction with the public). The ALJ included all of Plaintiff's other claimed limitations in his hypothetical to the vocational expert. Thus, any error in weighing the medical opinions or Plaintiff's credibility was harmless, because the ALJ's determination of the extent of Plaintiff's credible limitations is still supported by substantial evidence. Consequently, the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence.

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552 (1988); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Johnson, 529 F.3d at 564; Richardson, 402 U.S. at 401.

Accordingly, it is HEREBY RECOMMENDED:

1.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

2.      The Clerk of Court shall CLOSE the case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within

fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: July 29, 2014                                 s/Gerald B. Cohn
                                                  GERALD B. COHN
                                         UNITED STATES MAGISTRATE JUDGE